Summers J.
The question to be determined is the constitutionality of the act of the general assembly, passed March 27, 1893, entitled “An act to authorize the boards of city affairs in cities of the second grade, second class, to contract for the removal and disposition of garbage, night soil, dead animals and animal offal, and to erect and maintain garbage crematories or furnaces for such purposes. ’ ’ 90 Ohio Local Laws, 375.
The plaintiffs, in their petition, aver that they are residents and taxpayers of the city of Dayton; that they had in writing requested the solicitor to bring suit, and that the defendant Weidner, and others of the defendants, compose the board of city affairs of said city; that said board has entered into a contract with The Dixon Sanitary Crematory Company for the construction of a crematory; that bonds *2 of said city have been sold to pay for the same, and that the city is about to levy a tax to pay said bonds, and for the removal of garbage under said act, which it avers is in contravention of section 26 of article 2, and of section 1 of article 13, of the constitution, Dayton being the only city of the second grade'of the second class; and they pray for an injunction restraining the city from levying any tax to pay said bonds or to carry out the provisions of the act, and for a rescission of the contract for the construction of the crematory.
A demurrer to the petition was filed and overruled, and a temporary injunction allowed, and an answer was then filed averring that the bonds had been sold and the money paid into the city treasury; and that the contract for the crematory had been entered into before the written request was made upon the city solicitor; states facts showing the regularity of all proceedings under the act, and avers that the city has a population of 79,331; that Montgomery county is densely populated; that the city cannot, unless permitted to build a crematory, otherwise dispose of its garbage than by dumping it in the river, wüereby it is polluted and the public health endangered.
To this answer a general demurrer was interposed and sustained, and the injunction made perpetual, and.the case appealed to this court.
Section 1 of the act in question provides: “That boards of city affairs in all cities of the second grade, second class, be, and they hereby are authorized to contract” for the removal of garbage.
Section 2. That they may, when in their judgment the best interests of the city will be subserved thereby, build crematories.
Section 3. That they may issue bonds for that purpose.
Section 4. That the city council of any such city may levy a tax to pay the bonds and interest thereon, and
*3 Section 5. That in any such city, when the board of city affairs may build and equip such garbage crematory or crematories, furnace or furnaces, the city council of such city may levy a tax to operate the same.
The act is published in the volume containing the local laws of 1893, and under its title is the word [Dayton] in brackets.
The act confers corporate power, and its constitutionality depends upon the validity of the system of classification of cities adopted by the general assembly; for Dayton is the only city in the second grade of the second class, and if such classification is not warranted, then the act is special and confers corporate power in violation of article 13, section 1, of the constitution, which provides that, “the general assembly shall pass no special act conferring corporate powers.”
The present system of classification of municipal corporations into cities, villages and hamlets, and the division of cities into cities of the first class, first, second and third gradps, and into cities of the second class, first, second, third and fourth grades, was first adopted with the revision of the statutes in 1880, and Dayton was then, now is, and ever since has been, the only city of the second grade of he second class.
The provision in the Revised Statutes of 1880 was, “Section 1548. Existing corporations organized as cities of the second class, shall remain such until they become cities of the first class, and their grades, and the grades of those which may be, or may become, cities of the second class, shall be determined as follows: those which on the first day of July, last, had, and those which, on the first day of July in any year, have, when ascertained in the way mentioned in the last section, more than thirty thousand five hundred, and less than thirty-one thousand five hundred inhabitants, shall constitute the first grade; those which on the first day *4 of July last, had, and those which, on the first day of July in any year, have, when ascertained in the same way, more than twenty thousand, and less than thirty thousand five hundred inhabitants, shall constitute the second grade.”
The system then adopted has been upheld by repeated decisions of the supreme court.
Under the decisions an act which confers corporate power upon all the cities of one of the grades of one of the classes of cities into which they have been so divided by the general assembly, or which relates to the administration by them of their government, is not in contravention of section 6 of article 13, which provides that the general assembly shall, provide for the organization of cities and villages by general laws, or of section 1 of article 13, which provides that the general assembly shall pass no special act conferring corporate powers, or of section 26 of article 2, which provides that laws of a general nature shall have a uniform operation throughout the state, although there may be [but one city in such grade, unless the act is so limited in its provisions that it cannot apply to cities thereafter coming into that grade.
In State ex rel. Attorney General v. Hawkins, 44 Ohio St. 98, it is held that, ‘‘The act of the general assembly, passed April 3, 1885. (82 Ohio Laws, 101-11), conferring, certain corporate powers on cities of the first grade of the first class, is one of a general, and not of a special, nature; and, therefore, not in conflict with article 13, section 1, of the constitution, prohibiting the passage of special acts conferring such powers.”
And in The State ex rel. Attorney General v. Hudson, 44 Ohio St. 137, it is held that: ‘‘The act of April 3,. 1885 (82 Ohio Laws, 101),providing for a police force in ‘cities of the first grade of the first class,” applies to all cities of that grade and class in the state, and is a law of a general nature, having a uniform operation throughout the state, and is constitutional.”
*5 In The State ex rel. v. Smith et al., 48 Ohio St. 211, it is held that: “A statute applicable only to a particular ■city in the grade and class to which it belongs, and which cannot, by reason of its provisions,be adapted to any other city in the same grade and class, is special in its nature, and not general, and where corporate power is conferred thereby, is invalid.”
. In The State v. Pugh, 43 Ohio St. 98, the act under consideration, providing for the reorganization of cities of the first grade of the second class, was held invalid for the reason that its provisions so limited it that it would not apply to cities thereafter coming into that grade, and Columbus then being the only city in that grade and class, the act was special.
It is unnecessary, however, to review the many decisions upon this question. The system of classification has been greatly developed or refined since its inception, and the law applicable thereto as it now exists, has grown out of these decisions, and the consideration of the question in the many cases in which they were made. This will appear from an examination of the many cases in their order: Welker v. Potter and wife, 18 Ohio St. 85; The State ex rel. the Attorney General v. City of Cincinnati, 20 Ohio St. 18; The State ex rel. the Attorney General v. Covington, 29 Ohio St. 102; The State ex rel. v. Mitchell, 31 Ohio St. 592; McGill v. The State, 34 Ohio St. 228; Bolton v. City of Cleveland, 35 Ohio St. 319; State v. Powers, 38 Ohio St. 54; State v. Brewster, 39 Ohio St. 653; Bronson v. Oberlin, 41 Ohio St. 476; Falke, ex parte. 42 Ohio St. 638; State v. Pugh, 43 Ohio St. 98; State v. Hawkins, 44 Ohio St. 98; State v. Hudson, 44 Ohio St. 137; State v. Anderson, 44 Ohio St. 247; State ex rel. Herron v. Smith, 44 Ohio St. 348; Marmet v. State, 45 Ohio St. 63; State v. Wall, 47 Ohio St. 499; State v. City of Toledo, 48 Ohio St. 112; State v. Smith, 48 Ohio St. 211; Cos *6 tello v. Wyoming, 49 Ohio St. 202; City of Kenton et al. v. State, 52 Ohio St. 59; Carr v. Village of West Oarrolton, 8 Ohio Cir. Ct. Rep., 1; State v. Bargus, 53 Ohio St. 94; Cincinnati v. Steinkamp, 35 Weekly Law Bulletin, 146; Hixson v. Burson, 35 Weekly Law Bulletin, 280.
However, it is claimed that the supreme court has indicated a purpose to hold all classification unwarranted by the constitution, and that therefore these decisions are not binding, and we should anticipate such a decision by holding this act special, or at least consider the question as res integra. The last two cases above noted are cited in support of this claim. Whether or not the Steinkamp case is distinguishable from earlier decisions is not for us to question Spear, J., writing the opinion, says, page 208: “It is not intended by this holding to overturn earlier decisions of the court upon kindred questions. Each case stands, and must stand, upon its peculiar facts and circumstances.”
We think that case is distinguishable from this. It will be observed that the act under consideration in that case did not confer power upon cities of the first grade of the first class to regulate the construction of buildings within their limits, but provided for the appointment, by the mayor of such cities, of inspectors, and prescribed their duties and the regulations to be observed, and provided that any person violating any provision of the act should be guilty of a misdemeanor and subject to fine and imprisonment. If the act had conferred the power upon cities of the first grade of the first class, any such city could, by ordinance, have prescribed the same regulations and enforced them by fine and imprisonment, and the act would not have been in conflict with section 26 of article 2. Falk Exp. 42 Ohio St. 638, 644.
Why the dictum of the learned judge who wrote the opinion in Hixson v. Burson, that the doctrine of classification of cities should be overruled, should excite so much *7 interest, if not apprehension, is not apparent, since the same judge, in State v. Nelson, 52 Ohio St. 88, 99, said: “As the statutes affecting different cities and villages of different classes, practically do not operate in every part of the state, but only where a city or village of the particular class is found, it might seem that such laws do not operate uniformly throughout the state. A moment’s reflection will show that this is not so. If a new city or village of a particular class should be built up in the wildest spot in the state, the statutes applicable to such class of cities or villages, would be found to be in force there,and,in that sense, all statutes applicable to different classes of cities and villages, are in uniform operation in every part of the state,” and especially in view of the fact that the court itself, in State v. Wall, 47 Ohio St. 499, 500, said: “Grave doubts may well be entertained as to the constitutionality of this method of classifying cities for the purpose of general legislation, ” and in State v. Smith, 48 Ohio St. 211, 218: “It must be conceded that the method of classifying cities for the purpose of legislation, has been carried to the very verge of constitutional authority. Many conscientious minds believe that it has been exceeded.” And the judge falls into error when he says that “the doctrine of classification of cities and villages, as heretofore upheld, has been applied only to their organization, and has not been, and cannot be, applied to subjects in such cities which are of a general nature, and require laws of a uniform operation throughout the State. ’ ’
The act (82 Ohio St. 156), authorizing the board of public works of any city of the first grade of the first class, to cause its streets to be paved and to issue bonds of the city to the amount of two millions of dollars, in no manner related to the organization of such cities, but was upheld. Scheer v. Cincinnati, 14 Weekly Law Bulletin, 87; affirmed by the supreme court, 15 Weekly Law Bulletin, 66. Ex *8 cept for an application of the doctrine of classification it must have been held invalid, because special, and conferring corporate powers. The same is true of the act (86 Ohio Laws, 7), authorizing any city of the third grade of the first class to issue its bonds for an amount not exceeding seven hundred and fifty thousand dollars for supplying natural gas, upheld in State v. City of Toledo, 48 Ohio St. 112. Many other instances might be given. Division 2 of Title XII, Revised Statutes, relates to organization. And so, too, if by the expression “subjects in such cities which are of a general nature,” the learned judge meant “general subjects,” for many of the cases cited expressly decide that the word “general,” as used in section 26 of article 2, may relate to one grade and class of cities only; that a law is not necessarily of a general nature by reason simply of its being upon a general subject, and that a law applicable to a whole class is a law of a general nature, and has a uniform operation throughout the state, within the meaning of this constitutional provision.
In view of the interest which is at present manifested in the question of special legislation for cities, it may not be improper to consider, briefly, the subject of municipal government.
Until comparatively recent years the great majority of people lived in the country, and the matter of municipal government received little if any attention here or elsewhere. Our studies were all of questions relating to the state and national government. But all this is now changed.
Under old conditions, country life was the rule, and town life was the exception. But under the new conditions, urban life becomes the necessary lot of an ever-increasing proportion — a proportion that in several countries has now reached preponderant dimensions, while in all civilized lands a like result is only a matter of a few years.” Municipal Government in Great Britain, by Albert Shaw,page 4.
*9 The same authority gives statistics showing that whereas in 1801, in Scotland, there were three country dwellers to one citizen of a town — there are now three townspeople for every one who lives in the country; and further, that in England the majority of the population is urban. The tendency in this country is the same, In 1800, less than one in twenty-five lived in cities; in 1850 one in eight; in 1880, about one in four, and now about one in three. And «orne idea of the importance of the subject may be obtained from the statement that, for the year 1888, the value of property in these corporations, in Ohio, returned for taxation, was more than five hundred and eighteen millions of dollars; that the amount of tax, including school tax, levied annually, was more than fourteen millions of dollars, or about equal to that raised by taxation for all other purposes in the state; and that their total bonded indebtedness September 1, 1888, was about forty-five millions of dollars; that of the ■counties being a little over six, and of the state seven millions of dollars. From 1803 to 1851, inclusive, charters were granted in this state to three hundred and eighty-two cities, towns and villages, and six hundred and twenty-two acts by the general assembly were passed relative thereto. Th'ese charters possessed many features in common, but no system was attempted until after the adoption of the constitution of 1851, section 6 of article 13 of that instrument directing the general assembly to provide for the organization of cities and villages by general laws. Accordingly, May 3, 1852, an act to provide for the organization of cities and incorporated villages was passes (52 Ohio Laws, 223), comprising in one hundred and eleven sections, a system for the government of all the municipalities in the state, and providing for the organization of new towns and cities. The provision of our constitution, requiring legislation with respect to cities to be by general laws,was supposed to be a distinctive feature of our system. Gholson, J., in. Thomas *10 v. Village of Ashland, 12 Ohio St. 124, 130. But it was not. The example had been set in the Municipal Corporations Reform Act pf 1835. Dillon on Municipal Corporations, section 36, 41, notes. Municipal Government in Great Britain, 27, 28.
Strange as it may seem, it is nevertheless true, that in the convention which framed the constitution of 1851, there was no committee on municipal corporations, and section 6 of article 13, emanated from the “Committee on corporations other than banking.” It is almost a literal copy of a provision of the constitution of New York of 1846,excepting that the words “by general laws” are inserted. Section 1 of article 13, provides: “The general assembly shall pass no special act conferring corporate powers,” and section 2 of the same article:.“ Corporations maybe formed under general laws; but all such laws may, from time to time, be altered or repealed.” These provisions were intended to prevent abuses which had come into existence under the previous constitution. See observation of Ranney, J., in Atkinson v. M. &. C. R. R. CO., 15 Ohio St. 21, 35, and of Brinkerhoff, C. J., in State v. Cincinnati, 20 Ohio St. 18, 34, 35. One object was to secure the interest and attention of each member of the general assembly in each of such laws by the possibility, if not probability, that his own constituents might be affected by its provisions, and thus to prevent pernicious legislation which had received the consideration only of the members interested in securing it. For these reasons this same committee inserted in section'6 of article 13, the provision that the general assembly should provide for the organization of cities and villages by general laws. It is doubtful that section 1 of that article was intended to apply to municipal corporations, and Okey, J., in State v. Pugh, 43 Ohio St. 99, 135, says: “Ifthequesion were res integra, by no means could it be said to be clear that this court would hold that article 13, section 1, of the *11 constitution, has any application to municipal corporations. But, according to a series of cases, the provision does extend to municipal as well as private corporations, and since State v. Mitchell (31 Ohio St. 592), this court has regarded the construction of the constitution in that particular to be settled. But it was soon found that by reason of such construction of the constitution, there was great difficulty m framing bills for municipal corporations, in view of article 13, section 1, of the constitution; for what might be appropriate, or even necessary, for the welfare of one city, might be unnecessary or even mischievous, if applied to another. Apparently there were two ways in which the difficulty presented by that section could be ojbviated. One was to amend the constitution— a very difficult thing in Ohio. The other, which was adopted, was to give to article 13, section 6, such liberal construction as to enable the legislature, under the power of classification, to afford to each of the large cities of the state that which is, in effect, a substitute for a charter, by permitting corporate power to be conferred on any grade or class.” Just what scope should be given to the word “organization” in section 6 of article 13, is not apparent. Evidently that section was not intended to require that all laws relating to cities and villages should be general, and the supreme court has held valid many special acts relating to cities, but not conferring corporate powers.
But, be this as it may, the first act passed after the adoption of the constitution, the one already referred to, providing for the organization of cities and villages, divided the municipal corporations of the state into classes on the basis of population. Those having, or that might thereafter have, over twenty thousand population, were cities of the first class, and all other cities were cities of the second class. The act of 1852, while comprehensive in its provisions, did not meet all requirements, as is evidenced by the fact that *12 something like one hundred and eighty-four acts were passed! amending or supplementing it prior to the adoption of the municipal code in 1869 (66 Ohio Laws, 149.) The code comprised seven hundred and thirty-one sections, and embraced the previous system of classification, which was not changed until the revision of the statutes in 1880, the reasons for which are given in the preface to the Revised) Statutes for that year. The purpose was to place Cincinnati, Cleveland, Toledo, Columbus and Dayton, each, in a* grade by itself, so that each readily might obtain what was-supposed to be necessary legislation. In 1850 these cities-had, respectively, in round numbers, a population of 115,-000, 17,000, 3,000, 17,000, and 10,000. While in 1880-they had increased to 255,000, 160,000, 50,000, 51,000 and 38,000, and found their clothes too small. This system of' classification was upheld, and these cities each obtained what it wanted, or what somebody said it wanted. The example so set was infectious, and many other places thought they needed special legislation, but found it difficult to obtain in a form that would stand a judicial test, because they were not in separate grades, and other legislators besides. the members from their own county had to be consulted. The result is a demand for still further classification, and it is conceded that the present system can be readily changed so as to place each of the cities of the state in a separate grade. In many of the opinions, in the cases cited, it is assumed that it is impossible to provide for the organization, regulation and government of all municipal corporations by general laws. The evidence is to the contrary. Mr. Shaw, Municipal Gov. in Great Britain, page 28, says of the reform act of 1835, heretofore referred to: “The bill reformed and assimilated the government of 178 borroughs (about seventy in Scotland had been reconstructed by the act of 1833), and provided an intelligible system under which 125 more English and Welsh towns have come under *13 the enjoyment ofjcorporate privileges. From time to time new enactments applying in general to all municipal corporations were made by parliament, modifying at some points the structure of town government, but affecting more usually the scope and functions of the municipal administration. The chiefjoutlines of the act of 1835 had remained unobscured. Considered as a system, the municipal government of England had acquired a permanent foundation, and a staunch framework. But nearly naif a century of experience andjofjgrowing institutional and social life had placed several scores of additional laws upon the statute books, when, in 1882, it was decided to consolidate and revise all existing statutory provisions relating to the incorporated towns into a lucid municipal code.” This code, which provides for the government of three hundred and three cities, jcontainsjjust two hundred and sixty-nine sections. But the object sought is local self-government, of which, largely, our people, under existing laws, are deprived. Under our system of classification, placing each of the principal cities in a separate grade, it has not been difficult to secure the passage of laws in reference to any such city, for the practice prevails generally of treating such bills on their passage as the concern of no one but the member from the county in which the city is located. Consequently there is a disposition by interested parties to control municipal affairs by laws passed by the general assembly, instead of allowing the citizens’to control them under general and comprehensive laws conferring the''power upon the municipalities, and we are undergoingran experience in some respects similar to that of New York. Referring to this matter, the commissioners appointed by governor Tilden in 1875, to devise apian for the government of pities in the state of New York, say:
*14 “It may be true that the first attempts to secure legislative intervention in the local affairs of our principal cities were made by good citizens, in the supposed interest of reform and good government, and to counteract the schemes of corrupt officials.
“The notion that legislative control was the proper remedy was a serious mistake. The corrupt cliques and rings thus sought to be baffled were quick to perceive that in the business of procuring special laws concerning local affairs, they could easily outmatch the fitful and clumsy labors of disinterested citizens.
“The transfer of the control of the municipal resources from the localities to the Gapitol had no other effect than to cause a like transfer of the methods and arts of corruption, and to make the fortunes of our principal cities the traffic of the lobbies. Municipal corruption, previously confined within territorial limits, thenceforth escaped all bounds, and spread to every quarter of the state. Cities were compelled by legislation to buy lands for parks and public places, because the owners wished to sell them; compelled to pave, grade, and sewer streets without inhabitants, and for no other purpose than to award corrupt contracts for the work. Cities were compelled to purchase, at the public expense and at extravagant prices, the property ne ¡essary for streets and avenues, useless for any other purpose than to make a market for the adjoining property thus improved. Laws were enacted abolishing one office and creating another, with the same duties, in order to transfer official emoluments from one man or another; and laws to change the functions of officers, with a view only to a new distribution of patronage, and to lengthen the. terms of offices, for no other purpose than to retain in place officers who could not otherwise be elected or appointed. ’ ’
Fuller extracts may be found in Brice’s The American Commonwealth, vol. 1, 609. The author says: “There is no denying that the government of cities is the one conspicuous failure of the United States;” and one of the causes assigned is: “The assumption by the legislature of the direct control of local affairs. ” The same author (page 615), is authority for the statement that the constitutions of eleven *15 states now provide that cities shall be incorporated by general laws. “This prohibition of special legislation has generally worked well, though it is sometimes evaded.”
The whole matter is very forcibly set forth by Hon. W. R. Grace, in an article in Harper’s Monthly, in 1883:
“General incorporation acts, rather than special charters, would seem clearly to be the best method of creating and organizing municipal corporations. 1. Such acts tend to prevent favoritism and abuse in procuring extraordinary grants of special powers. 2. They secure uniformity of rule and construction, all being created and endowed alike, real wants are the sooner felt and provided for, and real grievances the sooner redressed. ” Dillon’s Municipal Cor-porations, section 41.
On the other hand Professor Goodnow, of Columbia College, in his recent timely and valuable work, “Municipal Home Rule,” gives a list of twenty states having constitutional provisions prohibiting the incorporation of cities by special act and, after a consideration of the many cases arising under these provisions in the different states, says: “Finally, are not the conditions of the various cities within a given state so varied as to make it impossible to govern them all to advantage by one general law, which attempts to fix in their details the municipal organization and the functions which this organization is to discharge? This was evidently the opinion of the late constitutional convention of New York, which, instead of prohibiting special legislation, merely hedged it about with formalities which it was hoped would prevent it from having evil results. These are the-reasons, also, why the courts have, through the exercise of their powers of interpretation, almost nullified the constitutional provisions requiring general acts for the incorporation and regulation of municipalities. The fact that they have, when looking at the matter from the private-legal point of view, been able to delimit quite satisfactorily and logically a sphere, of municipal private action, would prove beyond a doubt that the failure to accomplish the same result, when considering the matter from the public-legal *16 point of view, was not due to lack of judicial knowledge or powers of legal perception,. They have simply refused, in the way so characteristic of courts entrusted with powers of judicial legislation, to apply to conditions, where its application would be fraught with evil, a general legal principle of which they were perfectly well aware, and for whose development in its proper sphere they were themselves responsible. The fact that they have acted thus has probably saved us from stagnation in municipal development and disintegration in the administration of central matters.”
The occasion for most of this so called special legislation has been the absence of any power in the municipality to issue bonds for the purpose of raising money for necessary municipal improvements, the cost of which was in excess of the sum which could be raised within the limits of its authorrized rate of taxation; and the demands of party politics that the cities be controlled by boards appointed by some officer designated by act of the legislature.
When the people perceive that the best interests of the state will be subserved by permitting the inhabitants of its cities to administer their own municipal affairs rather than by entrusting them to the control of the general assembly, and by a constitutional provision delimit a sphere of municipal home rule, which provision shall e held to vest in the municipality power to do whatever may fall within the purview of such a corporation, unless clearly prohibited or reserved for legislative control, then legislation by general laws will be not merely desirable, but possible.
But, desirable as such a system may be, it probably cannot be had, except by a constitutional provision securing to the municipalities the right of local self-government,' and directing that their organization,regulation and government shall be provided for by general laws, and that any law in relation thereto shall be general, applying to all; and if classification be deemed essential, let it be general and fixed in the constitution. But these questions are for publicists, and not for the courts.
*17 That many abuses would have been precluded by a refusal to recognize the doctrine of classification, is not questioned, but that a repudiation of the doctrine, now, would result in greater good than harm seems to be doubted by the supreme court,
In State v. Brewster, 39 Ohio St. 653, 658, it was held: “The classification of municipal corporations, provided for in the Revised Statutes, sections 1546-1550, referred to in the act of 1883 (80 Ohio Laws, 124), is authorized by the constitution, and is not in conflict with article 2, section 26, nor article 13, section 6.” And in the opinion it was said: “ We hold that statutory provisions, with respect to any such class, are, for governmental purposes, general legislation, and not in conflict with article 2, section 26, nor article 13, section 6, of the constitution.” And Judge Okey, in his dissenting opinion, in State v. Pugh, 43 Ohio St. 98, 137, says of the above decision: “If not a rule of property within Arrowsmith v. Harmoning, 42 Ohio St. 254, that case should be adhered to, unless the clearest and most cogent reasons can be'given for overturning it. But there is no such reason.”
In State v. Hawkins, 44[)Ohio St. 98, 108, where the doctrine of classification was involved, Minshall, J., says: “To hold this statute invalid, for the reasons stated, would be to deprive, not only Cincinnati, but every city of this state, of any system of municipal government whatever; as all statutes conferring’"corpoiate power upon the municipalities of the state apply, in terms, to cities of certain grades and classes. There should be something more than a mere question as to the validity of a statute, to warrant a court in a holding that it must lead to such serious consequences.”
And Follet, J., in State v. Hudson, 44 Ohio St., 137, 139, where it was claimed the same act was in violation of section 26 of article 2, says: “This question vitally affects *18 Cincinnati, as well as Cleveland, Toledo, Columbus and Dayton; for, at present, under our system of classification of cities, there is but one of these cities in a general class. This act (section 1870), applies to “cities of the first grade of the first class” — to all such cities in Ohio — though Cincinnati is now the only city in that class. Each city just 'named is now similarly situated. Each of the large cities ' seem to need peculiar legislation, which can be provided only- by such general classification. The peace and prosperity of these cities, and the best interest of the state, require that this system of classification be regarded as stare decisis and settled. See Revised Statutes, section 1546.”
McMahon & McMahon and G. V. Nauerth, for plaintiffs.
R. A. Harrison and E. P. Mattheios and G, H. Bosler, Oity Solicitors, for defendants.
In Marmet v. State, 45 Ohio St. 63, 66, Spear, J., says: “The classification provided for by sections 1546 and 1547 of the Revised Statutes, has been sustained by repeated adjudications of this court, in cases involving questions as to the conferring of corporate powers, as to assessments, and as to governmental regulation, and it is too late now to question the validity of those sections.”
And to the same effect is the peí■ curiam in State v. Wall, 47 Ohio St. 211, 218.
“ Stare decisis et non. quieta move re” if nothing more, requires this court to declare such acts constitutional until these cases are overruled by the supreme court, or a differ - 'ent. system of classification is adopted by the legislature.
The demurrer to the answer, searching the record, will be sustained, to the petition the injunction dissolved, and the petition dismissed.
[Affirmed by Supreme Court without report, June 26, 1896.|